Cynthia M. MALESKI, Insurance Commissioner of the Commonwealth of Pennsylvania, as Statutory Liquidator of Corporate Life Insurance Company, By her Deputy William S. TAYLOR, Jr. and Newspan, Inc., Plaintiffs,

v.

DP REALTY TRUST et al., Defendants.

Commonwealth Court of Pennsylvania.

Argued Nov. 29, 1994.

Decided Dec. 14, 1994.

Publication Ordered Jan. 18, 1995.

William G. Frey, Jerome J. Shestack, Zachary L. Grayson and Donald K. Joseph, for plaintiffs.

Alan M. Rosen and Joshua R. Slavitt for defendants, DP Realty et al.

Brian J. McMonagle, for defendant, Steven Sechrest.

PELLEGRINI, Judge.

Before us are preliminary objections of the defendants, DP Realty Trust (DP), DP Realty Trust, Inc. (DP Inc.), Covest Ltd. (Covest), Ficrest Retirement Corporation (Ficrest), Ficrest Retirement Nominee Trust (Ficrest Trust), Robert F. Feige (Feige), Timothy D. Cox (T. Cox), Bernard Cox (B. Cox), and Steven Sechrest (Sechrest), to a complaint filed against them by Cynthia M. Maleski (Maleski), the Insurance Commissioner of the Commonwealth of Pennsylvania (Statutory Liquidator) acting in her capacity as the statutory liquidator of Corporate Life Insurance Company (Corporate Life), and Newspan, Inc. (Newspan).[1]

By order of this Court dated February 15, 1994, Corporate life, a Pennsylvania-based stock life insurance company, was placed into liquidation pursuant to Chapter V of the Insurance Department Act[2] (Insurance Act) due to insolvency. In accordance with that order, Maleski was appointed Statutory Liquidator and vested with all of the powers of that post conferred under the Act. *See* 40 P.S. § 221.21, 221.23(23). On July 1, 1994, pursuant to these powers, Maleski brought this action in this Court's original jurisdiction alleging claims for breach of contract, breach of fiduciary duty, conversion, fraud, fraudulent conveyance, and negligence against the above mentioned defendants.

The allegations of the complaint, which at this stage of the pleadings, with the exception of the *in personam* matter, we are required to accept as true,[3] describe the parties as follows:

- Feige is a Massachusetts citizen engaged in the business of buying, selling, brokering and servicing real estate mortgage loans, conducting these activities individually and through companies that are owned and controlled by him.

- Sechrest is a citizen of North Carolina who is an owner, officer or director of DP, DP Inc., Ficrest, as well as other entities.

- DP is a Massachusetts business trust, owned and controlled by Feige and T. Cox, of which both Feige and Sechrest are fifty percent beneficiaries.

- DP Inc. is a Tennessee corporation which is owned and controlled by Sechrest and Feige and is engaged in the business of buying and selling mortgages.

- Covest is a Massachusetts corporation engaged in the business of servicing mortgages which is owned by Feige and his wife.

- Ficrest is a Massachusetts corporation owned and controlled by Feige and Sechrest.

1. Although two sets of preliminary objections were filed, they make the same contentions, and therefore, will be considered without distinction in this Opinion.

2. Act of May 17, 1921, P.L. 789, *as amended*, 40 P.S. § 221.14.

3. *Santiago v. Pennsylvania National Mutual Casualty Insurance*, 418 Pa.Superior Ct. 178, 613 A.2d 1235 (1992).

• Ficrest Trust is a Massachusetts corporation owned and controlled by Feige and B. Cox, of which both Feige and Sechrest are fifty percent beneficiaries.

As to the facts, the complaint alleges as follows: Frederic Richardson (Richardson) and Sechrest wanted to locate an insurance company to purchase on a "mortgage margin." (¶ 23). To this end, Sechrest contacted Feige, a mortgage broker, to locate a company to purchase, eventually deciding on Corporate Life. (¶ 23). Sechrest and Feige formed DP Inc., with no capital, to facilitate this acquisition along with Richardson, who formed American Homestead, Inc., (American Homestead) to be the corporation that actually was to acquire Corporate Life. (¶ 23).

To initiate the acquisition, Richardson approached Corporate Life and proposed a plan in which Corporate Life was to pay DP Inc. full par value for mortgages having a market value sixty percent of par. (¶ 24). In turn, American Homestead was to make a capital contribution to Corporate Life funded by DP Inc.'s purchasing of American Homestead preferred stock which was funded by the forty percent difference between the price paid by Corporate Life for the mortgages and the sixty percent of par DP Inc. paid for the mortgages it conveyed to Corporate Life. (¶s 24, 35).[4]

Corporate Life agreed to this plan, and on February 28, 1991, it entered into a Stock Exchange Agreement with American Homestead. (¶ 25).[5] This agreement was amended by the parties on May 7, 1991, (Amended Stock Exchange Agreement) with Corporate Life agreeing to pay DP Inc. the $14.2 par value for mortgages which had a market value of only $9 million. (¶ 25).[6] Corporate Life booked these mortgages, not at their market value, but rather, at their par value. (¶ 25).

In addition to the Amended Stock Exchange Agreement, the parties subsequently entered into several other agreements dealing with the purchase and management of the mortgages by Corporate Life. One such agreement was the "Post–Transfer Agreement," entered into by the parties on May 7, 1991, whereby Corporate Life agreed to purchase, and in fact did purchase, an additional $52 million in mortgages from DP Inc. over a period of fourteen months. (¶ 33). Further, the parties also entered into an "Agency Agreement" on that same day which provided that all of the mortgages purchased by Corporate Life would be serviced by an affiliate of DP Inc., CoVest. (¶ 34).

With respect to the mortgages purchased under the Amended Stock Exchange Agreement, DP Inc. served a dual role, both as the broker of the mortgages and as a principal of American Homestead through its ownership of preferred stock in that company. (¶ 26). In its capacity as the broker, DP Inc. represented to Corporate Life, as well as to the Pennsylvania Insurance Department (Insurance Department), that the mortgages were valid, legal and binding obligations. (¶ 27). The Insurance Department conditionally approved the acquisition of these mortgages, provided that they met fourteen specified criteria. (¶ 27).[7] DP Inc. and Corporate

---

4. Apparently, although American Homestead's capital contribution was entered onto Corporate Life's annual statement to the Insurance Department, no such contribution was made. Rather, American Homestead "gave" the preferred stock to DP Inc. (¶ 36).

5. The allegations of the complaint are unclear as to if and when American Homestead acquired Corporate Life.

6. The Amended Stock Exchange Agreement also required DP Inc. to replace any defective mortgages which it may have sold to Corporate Life during the transaction. (¶ 40).

7. Under these criteria, the mortgages were to be: whole loans; residential and secured by one to four family units; first liens; fully amortizing; grant default and foreclosure rights substantially equivalent to those contained in FNMA/FHLMC Uniform Instruments; contain special waiver of homestead, dower or similar marital rights; contain no provision for a grace period following a partial prepayment; have no more than 3 × 30 days' past due in the past twelve months; must not be currently not paying; must be insured by title insurance, attorney's opinion or insurance bond for deed; must have mortgage insurance where the unpaid principal balance at origination exceeded 80 percent of the value of the property; must have hazard insurance for the balance of the security note; must have taxes paid current; and the broker or seller of the mortgages must replace them or repurchase them if they become delinquent.

Life represented to the Insurance Department that the mortgages did satisfy these criteria, when in fact, several of the criteria were not satisfied. (¶s 28, 29).[8]

As to the mortgages which failed to meet the criteria set forth by the Insurance Department, the Amended Stock Exchange Agreement required that DP Inc. repurchase or replace these mortgages with mortgages which satisfied the criteria. (¶s 38, 40). However, on February 28, 1992, Corporate Life and DP Inc. entered into a Restated Agreement which released DP from its obligation of replacing the defective mortgages. (¶ 38). Instead, this agreement permitted DP Inc. to replace the valuable mortgages which existed in Corporate Life's portfolio with mortgages having the same par value but a much lower market value. (¶ 39). Further, this agreement also granted DP Inc. the right to manage Corporate Life's portfolio, including the power to foreclose on the mortgages, to take deeds in lieu of foreclosure, and to accept discounted payoffs of the mortgages. (¶ 41). DP Inc. was required to split the profits from all of these transactions with Corporate Life. (¶ 41).

Subsequent to the Restated Agreement, Feige and DP Inc. began liquidating the mortgages in Corporate Life's portfolio, but did not split the profits derived from these sales with Corporate Life. (¶ 46). Instead, Feige deposited this money into DP Inc.'s general operating account and used it to pay expenses unrelated to the management of Corporate Life's portfolio. (¶ 48). Additionally, DP used some of this money to purchase more nonqualifying loans to sell to Corporate Life. (¶ 49).

In late 1992, the business relationship between DP Inc. and Corporate Life was deteriorating. (¶ 55). Fearing that Corporate Life would terminate the Restated Agreement with DP Inc. and the Agency Agreement with CoVest before DP Inc. could convert all of Corporate Life's assets, Feige and Sechrest created Ficrest to acquire Corporate Life properties from DP Inc. without

giving any consideration to Corporate Life. (¶ 55). DP Inc. "sold" assets to Ficrest in exchange for a "revolving credit note" executed by Ficrest. (¶ 56). Under this scheme, because DP had never recorded its previous mortgage assignments to Corporate Life, it was able to foreclose upon the real estate securing the mortgages in its own name and without Corporate Life's knowledge thereof. (¶ 57). Once DP Inc. had foreclosed upon the properties, it would then transfer them to Ficrest, and in exchange, the amount due from Ficrest on the revolving credit note would be increased. (¶s 56, 57). The amount due on the note reached approximately $1.8 million, of which, Ficrest allegedly paid DP Inc. $500,000 to $600,000. (¶ 58). However, Corporate Life never received any of these payments, and as a result of the transfer of assets from DP Inc. to Ficrest, $17 million of Corporate Life's assets had been removed from its portfolio. (¶ 60).

In addition to transferring Corporate Life's assets to Ficrest, DP Inc. also had failed to replace $7.4 million in nonqualifying mortgages which it had sold to Corporate Life and which was required under the Amended Stock Exchange Agreement. (¶ 61). Furthermore, the defendants have also retained hundreds of thousands of dollars in rent, mortgage payments and escrow balances for condominium properties in Corporate Life's portfolio. (¶ 62). CoVest has also retained significant fees which were not authorized under the Agency Agreement. (¶ 63). DP Inc. was notified of these incidents by Corporate Life, but has done nothing to correct them and continued to fail to comply with the agreements. (¶ 61).

Because of disputes between the parties as to DP Inc.'s failure to perform under the agreements, they entered into settlement negotiations during the latter part of 1992. (¶ 65). The parties attempted to enter into a settlement agreement on March 30, 1993, which provided for a two step escrow procedure with DP's counsel to serve as the escrow agent. (¶ 66). As part of this settle-

---

8. Unbeknownst to the Insurance Department, the mortgages were also deficient in the following respects: improper recordation, missing assignments, defective chains of title, delinquencies ex- ceeding the statute of limitations, outright foreclosures, and in some cases, the mortgages were nine years delinquent with loan-to-value ratios exceeding one hundred percent.

ment, the defendants agreed to return an alleged $4 million worth of loans and assets to Corporate Life. (¶ 67). However, this $4 million in assets consisted mainly of worthless deficiency judgments. (¶ 68). The agreement was never formally entered into by the parties, and the assets held in escrow were returned by the escrow agent to the defendants. (¶ 69). Prior to the termination of the settlement negotiations, however, Covest, DP's affiliate which was servicing Corporate Life's portfolio, had obtained an additional $1 million in Corporate Life's assets. (¶ 69).

In April, 1993, Corporate Life had obtained a new servicing agent, APX Mortgages Services, Inc. (APX). (¶ 72). At that time, CoVest was directed to transfer its Corporate Life mortgage files, which represented a remaining $24 million in assets, to APX. (¶ 72). CoVest purported to transfer these files, however, they were incomplete, thus precluding APX from servicing or transferring any of Corporate Life's assets. (¶ 73).

In June, 1993, Corporate Life commenced an action against all of the defendants, with the exception of T. Cox and B. Cox, in the United States District Court for the Eastern District of Pennsylvania, seeking equitable relief for an alleged breach of contract, breach of fiduciary duty, and conversion. (¶ 74). Corporate Life also sought a temporary restraining order freezing its assets which were in the possession of the defendants. (¶ 74). An agreement was entered into between the parties in lieu of the temporary restraining order in which, among other things, DP Inc. and Covest would not engage in any transfers with respect to the Corporate Life assets. (¶ 76). Subsequent to this agreement, however, DP sold several of Corporate Life's mortgages without giving Corporate Life any proceeds from the sale. (¶ 77). At the request of Corporate Life's prior management, the action was placed under seal. (¶ 75).

As a result of the allegedly fraudulent conduct of the defendants, $27 million of the $52 million worth of loans in Corporate Life's portfolio have not been accounted for by the defendants. $17 million in loans from Corporate Life's portfolio have been taken by the defendants for which Corporate Life has received nothing, and $7 million in defective mortgages were sold to Corporate Life which have not been cured by the defendants.

Based upon the allegations set forth above, the complaint sets forth ten counts against the defendants. The causes of action in these counts include:

- Count I—Breach of contract by the defendants' failure to replace the defective loans and to provide Corporate Life with the proceeds from the sale of its assets.
- Count II—Breach of the June, 1993 agreement, which was in lieu of a restraining order, by the defendants' failure to transfer mortgages to Corporate Life and by continuing to transfer Corporate Life's assets.
- Count III—Breach of fiduciary duty by the defendants' failure to account for the proceeds of the sale of the mortgages, failure to replace the mortgages they removed from Corporate Life's portfolio, and failure to provide accurate and truthful monthly statements with respect to the management of Corporate Life's portfolio.
- Count IV—Conversion for the $17 million in loans or proceeds from loans of which the defendants have retained unlawful possession.
- Count V—Breach of the terms of issued bonds by the failure to pay the bondholder on a quarterly basis and by the failure to require DP Inc. to replace the defective mortgages and to service Corporate Life's portfolio in a reasonable and professional manner.
- Count VI—Recision of an October, 1993 agreement in which Sechrest was to transfer a fifty percent beneficial interest in the defendant companies to Corporate Life.
- Count VII—Fraud with respect to the defendants' misrepresentations of the status and management of Corporate Life's portfolio.
- Count VIII—Negligence based upon the defendants' failure to exercise reasonable care in the management of Corporate Life's portfolio.

- Count IX—Statutory fraudulent conveyance based upon the transfer of assets to the defendants made less than one year prior to the filing of the Liquidation Petition.

- Count X—Injunctive relief based upon the harm which may result if the defendants are further permitted to transfer, sell or trade the remaining Corporate Life assets.

The Statutory Liquidator is requesting permanent injunctive relief prohibiting the defendants from further transferring any of Corporate Life's assets, and directing the defendants to deliver all of Corporate Life's assets into her possession. Further, the Statutory Liquidator seeks injunctive relief granting them access to all of the records relating to the management of Corporate Life's portfolio. The complaint also seeks compensatory and punitive damages against each of the defendants because of their alleged activity with respect to the assets of Corporate Life.

The defendants filed preliminary objections on the following grounds:

- legal insufficiency of the complaint due to the existence of the general release executed between the parties;

- the pending of a prior action in federal court;

- lack of personal jurisdiction over Ficrest, Ficrest Trust, T. Cox, B. Cox, DP, DP Inc., and Sechrest;

- the existence of an agreement for alternative dispute resolution;

- lack of subject matter jurisdiction;

- improper service of the complaint; [9] and

- failure to plead with specificity.

## I.

■ Because none of the defendants are domiciled or conduct business in Pennsylvania, the defendants object to the complaint, contending that this Court does not have *in personam* jurisdiction over them. In ruling on a preliminary objection, the court must consider the evidence in the light most favorable to the non-moving party. *Derman v. Wilair Services, Inc.,* 404 Pa.Superior Ct. 136, 590 A.2d 317, *application for allowance of appeal den'd,* 529 Pa. 621, 600 A.2d 537 (1991). If the granting of a preliminary objection will result in the dismissal of the case, then the objection should be sustained only if it is clear and. free from doubt. *Zinc Corp. of America v. Department of Environmental Resources,* 145 Pa.Commonwealth Ct. 363, 603 A.2d 288 (1992), *aff'd,* 533 Pa. 319, 623 A.2d 321 (1993). Moreover, the mere allegation in a preliminary objection that the court lacks *in personam* jurisdiction does not automatically place the burden of proving that the court has such jurisdiction upon the plaintiff. *Gall v. Hammer,* 420 Pa.Superior Ct. 512, 617 A.2d 23 (1992). Rather, the defendant must first support its challenge to the court's *in personam* jurisdiction by presenting evidence. *Id.* Only after the defendant has done so does the burden shift to the plaintiff to adduce sufficient competent evidence to establish the court's jurisdiction. *Accu–Weather v. Thomas Broadcasting Co.,* 425 Pa.Superior Ct. 335, 625 A.2d 75 (1993). To satisfy this burden, however, the plaintiff is not limited solely to the introduction of deposition testimony; the burden may be met via affidavits or other competent evidence. *Id.*

■ The power of a court to exercise *in personam* jurisdiction over a non-resident must: (1) be conferred by the Pennsylvania Long–Arm Statute [10] and (2) must meet the

---

9. During oral argument, the defendants conceded that the Statutory Liquidator has correctly served the complaint subsequent to the filing of the preliminary objections, and therefore, they were no longer pursuing this ground for dismissing the complaint.

10. 42 Pa.C.S. § 5322. This section provides:
 (a) **General Rule.** A tribunal of this Commonwealth may exercise personal jurisdiction over

a person ... who acts directly or by an agent, as to a cause of action or other matter arising from such person: ...
 (3) Causing harm or tortious injury by an act or omission in this Commonwealth.
 (4) Causing harm or tortious injury in this Commonwealth by an act or omission outside this Commonwealth.

constitutional standards of due process. *Hewitt v. Eichelmans's Subaru, Inc.,* 341 Pa.Superior Ct. 589, 492 A.2d 23 (1985). The reach of the Long–Arm statute is co-extensive with that permitted by the due process clause of the Fourteenth Amendment to the United States Constitution. *Koenig v. International Brotherhood of Boilermakers,* 284 Pa.Superior Ct. 558, 426 A.2d 635 (1980).

■ When a cause of action arises from the forum-related activities of the defendants, the constitutional analysis requires that the defendants have sufficient minimum contacts with the forum state to provide them with a reasonable anticipation of being hauled into court. *United Farm Bureau Mutual Insurance Co. v. United States Fidelity and Guaranty Co.,* 501 Pa. 646, 462 A.2d 1300 (1983). For example, if a defendant in one state reached out and created a continuing contractual obligation with a resident of the forum state, then that defendant may be subject to regulation by the forum state. *Crown–Globe, Inc. v. Grenoble Mills, Inc.,* 406 Pa.Superior Ct. 134, 593 A.2d 906 (1991). While an out-of-state party's contract with a resident of the forum state in and of itself is not sufficient to establish the requisite minimum contacts, the negotiations leading up to the contract, the future consequences of the contract, and the actual course of dealing of the parties during the contract may amount to purposeful availment of the privilege of conducting activities within the forum state, and thus, justify the exercise of *in personam* jurisdiction over the contracting party. *Kenneth H. Oaks, Ltd. v. Josephson,* 390 Pa.Superior Ct. 103, 568 A.2d 215 (1989).

■ In the present case, notwithstanding the fact that the defendants have offered no evidence to support their contention that this Court lacks *in personam* jurisdiction over them, the allegations of the complaint, as well as the verifications of Sechrest attached to the Statutory Liquidator's answer to the preliminary objections and motion to strike, are sufficient to establish that this Court has *in personam* jurisdiction over Ficrest, Ficrest Trust, DP, and DP Inc. These defendants entered into contracts with Corporate Life by which they agreed to sell mortgages to Corporate Life and to manage its portfolio. The performance of these contracts were to continue for an indefinite period, and in fact, it lasted for over two years. Moreover, Corporate Life is a Pennsylvania domiciled stock life insurance company which was organized pursuant to the laws of Pennsylvania and had its principal place of business in this state. Given these continuing contractual relations, as well as the actual course of dealings between the parties, Ficrest, Ficrest Trust, DP, and DP Inc. do have the requisite minimum contacts with Pennsylvania and should have had a reasonable anticipation of being subject to the jurisdiction of its courts. Consequently, this Court may constitutionally exercise *in personam* jurisdiction over these defendants.

### II.

■ This finding of *in personam* jurisdiction also extends to the individual defendants Sechrest, B. Cox and T. Cox, despite the fact that they never had direct contact with Pennsylvania, because of their relationship to the other defendants. While the courts of this Commonwealth have not squarely addressed this situation, a line of federal district court decisions have held that a court may not exercise jurisdiction over individual officers and directors of a corporation based solely upon acts taken in their corporate capacities. *See Simkins Corporation v. Gourmet Resources International,* 601 F.Supp. 1336 (E.D.Pa.1985); *Simpson v. Lifespring, Inc.,* 572 F.Supp. 1251 (E.D.Pa.1983), *aff'd without opinion,* 770 F.2d 1075 (3d. Cir.1985); *PSC Professional Services Group, Inc. v. American Digital Systems, Inc.,* 555 F.Supp. 788 (E.D.Pa.1983). However, the federal courts have recognized an exception to this rule when a corporate officer has been personally involved in a corporation's tortious conduct, and on that basis, has rested jurisdiction. *See Hough/Loew Associates, Inc. v. CLX Realty Co.,* 760 F.Supp. 1141 (E.D.Pa.1991); *In re Arthur Treacher's Franchisee Litigation,* 92 F.R.D. 398 (E.D.Pa.1981); *Donner v. Tams–Witmark Music Library,* 480 F.Supp. 1229 (E.D.Pa.1979); *Lighting Systems v. International Merchandising Associates, Inc.,* 464 F.Supp. 601 (W.D.Pa.1979); *Vespe Con-*

*tracting Co. v. Anvan Corporation*, 433 F.Supp. 1226 (E.D.Pa.1977).

 Those cases recognize that the purpose of the "corporate shield" doctrine is to protect corporate officers and directors from being haled into court and exposed to personal liability in each state that the corporation does business based solely upon their status as corporate officers and directors. *Central Pennsylvania Teamsters Pension Fund v. Burten*, 634 F.Supp. 128 (E.D.Pa. 1986). However, those cases also balance this purpose with the principle that, in Pennsylvania, corporate officers and directors are liable for the tortious acts the corporation commits under their direction or with their participation. *Al–Khazraji v. St. Francis College*, 784 F.2d 505 (3d Cir.1986), *aff'd*, 481 U.S. 604, 107 S.Ct. 2022, 95 L.Ed.2d 582 (1987).

Taking these principles into consideration, the federal courts have developed a case-by-case, flexible approach to determining the extent of long-arm jurisdiction. We believe that this approach is also appropriate to determine whether the Pennsylvania Long–Arm Statute reaches a corporation's officers and directors who directly participate in allegedly tortious action, albeit in their corporate capacities.

 To determine whether there is jurisdiction over a corporate officer or director whose only contact with Pennsylvania are allegedly tortious acts taken as corporate officers or directors, it is necessary under this case-by-case approach to examine factors such as the officer's role in the corporate structure, the quality of the officer's forum contacts and the extent and nature of the officer's participation in the alleged tortious conduct. *Moran v. Metropolitan District Council of Philadelphia*, 640 F.Supp. 430 (E.D.Pa.1986). By adopting this approach, we take the same common sense view as the federal courts that, unless jurisdiction is obtained over those corporate officers engaged

in tortious conduct, they will merely repeat the conduct over and over in other corporate guises.

 The complaint alleges that Sechrest, along with Feige, are each fifty percent owners of DP and DP Inc., as well as fifty percent shareholders in Ficrest. Additionally, the complaint alleges that DP was partially owned and controlled by T. Cox, and that Ficrest Trust was partially owned and controlled by B. Cox. The complaint also alleges that these defendants actively participated in the plan to obtain Corporate Life's assets by their failure to perform the duties under the various agreements, by forming Ficrest in order to purchase many of Corporate Life's assets at below market value, and by managing Corporate Life's assets in such a manner so that none of the money obtained from the transfer of these assets was returned to Corporate Life. Under the flexible jurisdiction analysis, these allegations, supported by the verification of Sechrest, make out sufficient minimum contacts between these defendants and Pennsylvania upon which we may exercise *in personam* jurisdiction over them as individuals, consistent with the due process protections of fair play and substantial justice.

### III.

 The defendants also contend that the complaint cannot be maintained because a release was executed between the parties which fully and completely released them from all claims which Corporate Life and Newspan had or may have against them. As the Statutory Liquidator correctly points out, however, the existence of a release and its effect on an action is an affirmative defense which must be pled under New Matter, not as a preliminary objection. *See* Pa.R.C.P. 1030.[11] Since the defendants raised the issue of the release in their preliminary objections and not in an answer with new matter, the defense cannot be considered at this time.

11. Although the Statutory Liquidator has raised this contention in a motion to strike as opposed to a preliminary objection, errors in nomenclature will not preclude this Court from considering a pleading for what it was intended and therefore, the Statutory Liquidator's objection to

the procedural defect in the defendants' preliminary objections has not been waived. *See McCarron v. Upper Gwynedd Township*, 139 Pa.Commonwealth Ct. 528, 591 A.2d 1151 (1991).

### IV.

■ With respect to the preliminary objection based upon the pendency of a prior action, the defendants contend that Corporate Life commenced an action against DP, DP Inc., Feige and Ficrest as defendants, with Sechrest being named as a plaintiff, in the United States District Court for the Eastern District of Pennsylvania. Since this action is still pending, the defendants contend, this Court should dismiss the Statutory Liquidator's action as to these five defendants. However, as indicated in the Statutory Liquidator's answer to the preliminary objections and Exhibit "A" attached thereto, the federal action was stayed on October 3, 1994. The District Court, citing *G.E. Burford v. Sun Oil Co.*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943), abstained, deferring to the courts of this state to resolve the issues involving Pennsylvania's complex scheme for regulating insurance and for the reorganization of Corporate Life. As such, to grant the defendants' preliminary objection on this ground would contravene the purpose of the District Court's stay, and in effect, would deprive the plaintiffs of a forum in which to pursue their action.

### V.

. The defendants also contend that, since they had entered into a Letter Agreement with the Statutory Liquidator on May 5, 1994, whereby the parties agreed to consolidate the claims pending in the United States District Court for the District of Massachusetts and in the Court of Chancery of the State of Delaware with the claim pending before the United States District Court for the Eastern District of Pennsylvania, the present action must be dismissed because of the existence of an agreement to submit to alternative dispute resolution. The defendants contend that this letter is evidence of the intent of the parties to have all claims between them resolved in one forum, namely the District Court in Pennsylvania. The Statutory Liquidator contends, however, that by its very terms, the Letter Agreement was not intended to submit all disputes to the District Court in Pennsylvania, but rather, expressly reserved in the Statutory Liquidator the right to proceed in this Court.

The relevant portion of the letter agreement at issue reads as follows:

2. Without prejudice to all of their respective claims and defenses, the parties consent to a grant of a motion to be filed by the Statutory Liquidator to consolidate the DE Action with the PA action and the parties consent to the grant of a similar motion to be filed by the plaintiff in the MA Action to consolidate the MA Action with the PA Action.

Defendants' Preliminary Objections, Exhibit B. Contrary to the defendants' contentions, however, this language does not constitute an agreement between the parties to submit all of their disputes to alternative dispute resolution. Rather, it constitutes an agreement to consolidate all of the actions pending before three different courts into one action before the Federal District Court in Pennsylvania, and therefore, constitutes an agreement to submit all of the claims to one forum. Consequently, instead of treating the defendants' preliminary objection as being based upon an agreement for alternative dispute resolution, we shall view this preliminary objection as being based upon a choice of forum agreement.

■ Generally, an agreement to submit a dispute to a particular forum will be upheld if it is reasonable. *Central Contracting Co. v. C.E. Youngdahl & Co.*, 418 Pa. 122, 209 A.2d 810 (1965). Such an agreement will be considered to be unreasonable if the chosen forum seriously impairs the plaintiff's ability to pursue a cause of action. If the forum specified in the agreement does not do substantial justice to the plaintiff's cause of action, then the agreement will not be enforced. *Id.* Furthermore, a choice of forum provision in an agreement cannot be upheld if it contravenes the express intention of the General Assembly. *General State Authority v. Sutter Corp.*, 24 Pa.Commonwealth Ct. 391, 356 A.2d 377 (1976).

■ Disregarding, for the moment, that the language relied upon by the defendants does not clearly constitute an agreement by the Statutory Liquidator to submit all claims

to the jurisdiction of the District Court, we nevertheless cannot interpret the agreement as urged upon us by the defendants. As evidenced by the reasons enumerated for the stay and abstention issued by the District Court, the Statutory Liquidator's pursuit of her cause of action in that forum would be significantly impaired. This action involves the regulation of Corporate Life under Pennsylvania's Insurance Act, the plaintiff's claim is brought pursuant to that Act. Further, the General Assembly has expressly stated that claims asserted by the Statutory Liquidator must be brought in this Court.[12] To require otherwise would contravene this expressed intent. The defendants' preliminary objection based upon the pendency of a prior action is denied.

## VI.

With respect to the preliminary objection based upon the lack of subject matter jurisdiction, the defendants contend that this Court lacks subject matter jurisdiction because the Statutory Liquidator only has alleged common law contract and tort claims. As such, the defendants contend, these actions do not arise under Article V of the Insurance Act, and therefore, pursuant to 42 Pa.C.S. § 761(a)(3), this Court is without original jurisdiction to consider the matter. As the Statutory Liquidator correctly points out, however, the actions asserted in their complaint do arise under Article V of the Insurance Act, vesting this Court with subject matter jurisdiction.

■ Section 221.26 of the Insurance Act provides that the "liquidator may, upon or after an order for liquidation, institute an action or proceeding on behalf of the estate of the insurer upon any cause of action" for which the statute of limitations have not expired. Act of May 17, 1921, P.L. 789, 40 P.S. § 221.26. Additionally, Section 221.28 of the Insurance Act permits the liquidator to avoid fraudulent transfers made by the insurer within one year of the filing of the liquidation

petition,[13] and Section 221.23 of the Insurance Act authorizes the liquidator to "collect all debts and money due and claims belonging to the insurer." *Id.*, § 221.23. Because this Court is expressly vested with the "original jurisdiction of all civil actions or proceedings ... [a]rising under Article V of the ... [Insurance Act]," [14] and since the Complaint, filed by the Statutory Liquidator of Corporate Life, alleges causes of action on behalf of Corporate Life and also seeks to recover fraudulently obtained assets, it arises under Article V of the Insurance Act. Accordingly, this Court has original jurisdiction over the claims.

## VII.

Finally, as to the preliminary objection in the nature of a more specific pleading, the defendants contend that, because this complaint is essentially based on fraud, the Statutory Liquidator failed to plead the specific assets, transactions, and dates at issue necessary for them to answer the complaint. As the defendants correctly point out, Pennsylvania Rule of Civil Procedure 1019(b) requires that a complaint aver fraud with particularity.

■ In determining whether the complaint avers fraud with sufficient specificity, this Court must look to the complaint as a whole [15] and ascertain whether it adequately explains the nature of the claim to the defendants so that they may prepare a defense, and whether it is sufficiently specific to convince the court that the averments therein are not merely a subterfuge. *Martin v. Lancaster Battery Co., Inc.*, 530 Pa. 11, 606 A.2d 444 (1992). However, a plaintiff is not required to plead evidence in his or her complaint, and therefore, need not allege all of the factual details underlying the claim of fraud. 3 Standard Pennsylvania Practice 2d 16:34, at 514 (1981).

■ Viewing the complaint as a whole, we believe that it is sufficiently specific to

---

12. 40 Pa.S. § 221.4(d).

13. Act of May 17, 1921, P.L. 789, 40 P.S. § 221.28.

14. 42 Pa.C.S. § 761(a)(3).

15. *Commonwealth by Zimmerman v. Bell Telephone Co. of Pennsylvania*, 121 Pa.Commonwealth Ct. 642, 551 A.2d 602 (1988).

allow the defendants to prepare a response. Not only does it provide the contracts and agreements which the plaintiffs allege served as the vehicle of the defendants' fraudulent activities, but it also sets forth the general transactions upon which the plaintiffs base their claim of fraud. Requiring the Statutory Liquidator to plead more would, in effect, be requiring her to plead evidentiary matters best left to the discovery stage of the proceedings.

We do, however, believe that Paragraph 31 of the complaint lacks the requisite specificity because it incorporates the five hundred paragraph Petition to Liquidate initially filed in this case. Such a broad incorporation fails to sufficiently inform the defendants of those portions of the petition which they will be required to defend.

Accordingly, the defendants' preliminary objection in the nature of a motion for a more specific pleading is granted with respect to paragraph 31 of the complaint. In all other respects, the preliminary objections are denied.

*ORDER*

AND NOW, this 14th day of December, 1994, upon consideration of the defendants' preliminary objections to the plaintiffs' complaint, it is ORDERED that:

(1) The motion for a more specific pleading is granted with respect to paragraph 31 of the complaint, and this paragraph is stricken from the complaint.

(2) The plaintiffs are granted 30 days leave to amend paragraph 31 of the complaint in accordance with the provisions of the accompanying Opinion.

(3) All other relief requested by the defendants is denied.